**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

In Re: HSBC BANK, USA, N.A., Debit Card
Overdraft Fee Litigation

                                           **MEMORANDUM OF**
                                           **DECISION AND ORDER**
                                           13-md-2451(ADS)(AKT)

-------------------------------------------------------X

**<u>APPEARANCES:</u>**

**Cuneo, Gilbert & LaDuca LLP**
*Co-Interim Class Counsel*
507 C Street, Ne
Washington, DC 20002
      By: Jonathan W. Cuneo, Esq.
         Sandra W. Cuneo, Esq., Of Counsel

**Cotchett Pitre & McCarthy, LLP**
*Co-Interim Class Counsel*
840 Malcolm Road
Burlingame, CA 94010
      By: Nancy L. Fineman, Esq.
         Aron K. Liang, Esq., Of Counsel

**Rigrodsky & Long, P.A.**
*Co-Interim Class Counsel*
825 East Gate Blvd
Suite 300
Garden City, NY 11530
      By: Seth Rigrodsky, Esq.
         Timothy J. MacFall, Esq., Of Counsel

**Cohen Law Group, P.C.**
*Co-Interim Class Counsel*
10 East 40th Street, 46th Floor
New York, NY 10016
      By: Brian S. Cohen, Esq.,
         Clifford J. Bond, Esq., Of Counsel

**Stroock & Stroock & Lavan LLP**
*Attorneys for the Defendants*
180 Maiden Lane
New York, NY 10038
      By: Joseph E. Strauss, Esq.
         Julia B Strickland, Esq.

Wesley M. Griffith, Esq.
Lisa M. Simonetti, Esq., Of Counsel

**SPATT, District Judge**.

This litigation encompasses allegations relating to the imposition of overdraft charges on certain debit card transactions by HSBC Bank USA, N.A. ("HSBC"). Specifically, the Plaintiffs allege that HSBC provides debit cards and/or ATM cards to its checking account customers. If there are insufficient funds for a given debit card transaction, it is considered an "overdraft." HSBC may allow such transactions for a given debit card transaction to proceed, but the account is charged an "overdraft fee" of $35. The Plaintiffs allege that, in order to maximize revenue from overdraft fees, HSBC posts debits to customer accounts in a non-chronological order and/or "largest to smallest" order, causing customers to incur multiple overdraft fees that would not have been imposed had the transactions been posted chronologically or in a "smallest to largest" order. The Plaintiffs also allege that HSBC fails to clearly disclose the posting order to its customers; does not advise them that they may opt out of HSBC's overdraft program; and fails to post deposited funds to their accounts in a timely manner, resulting in additional overdraft fees.

Three putative class actions, Ofra Levin et al. v. HSBC Bank USA, N.A. et al., E.D.N.Y. 12-CV-5696 (ADS); Darek Jura v. HSBC Bank USA, N.A. et al., E.D.N.Y. 12-CV-6224 (ADS); and Hanes v. HSBC Bank USA, N.A., E.D. Va. 13-CV-00229 were filed against HSBC in federal court.

On June 5, 2013, the Judicial Panel on Multidistrict Litigation ("MDL") centralized all three actions and assigned them to this Court. On July 22, 2013, this Court (1) consolidated the three actions for all pretrial purposes; (2) appointed co-interim class counsel; and (3) and

directed co-interim class counsel to file a consolidated class action complaint within thirty days of the date of that order.

On September 30, 2013, the amended consolidated class action complaint was filed. On November 1, 2013, the Defendants moved, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6), to dismiss the amended consolidated class action complaint, contending that the Plaintiffs' claims are preempted by the National Bank Act, 12 U.S.C. § 21, *et seq.*, (the "NBA") and, alternatively, fail to state a claim upon which relief can be granted. For the reasons set forth below, the motion is granted in part and denied in part.

## I.     BACKGROUND

A. Factual Background

1. HSBC's Overdraft Program

Unless stated otherwise, the following facts are drawn from the amended consolidated class action complaint and construed in a light most favorable to the Plaintiffs.

HSBC provides debit cards to its checking account customers, who include individual consumers and small businesses. Customers can use their debit cards to make purchases or withdraw money from ATM machines. HSBC is instantaneously notified of debit card transactions. HSBC can immediately determine whether customers have sufficient funds in their accounts to cover the transactions. HSBC can either accept or decline the transactions at that time. If a customer does not have sufficient funds in his or her or its account to pay for a transaction, the transaction is considered an "overdraft."

As part of its overdraft protection program, HSBC will, in its discretion, honor overdraft payments. Instead of declining overdrafts or informing customers that certain transactions will result in overdraft fees, HSBC routinely honors such overdrafts. If HSBC honors an overdraft, it

charges the customer a $35 fee for each overdraft.  At the time of the transaction, HSBC does not alert its customers that it will cause an overdraft.

The Plaintiffs allege that HSBC uses a computer program that is designed to manipulate customers' transaction records in order to maximizes overdraft fees.  Generally, this means that HSBC posts transactions from the largest to the smallest amount.  This practice is also called "high-to-low" posting.  A transaction is "posted" when HSBC either debits an expenditure from the customer's account or credits a deposit to a customer's account.  HSBC does not debit funds from a customer's account at the moment a transaction is made.  Instead, HSBC takes several days' worth of transactions and orders them from the highest to the lowest dollar amount before posting them to the customer's account.  If the account is overdrawn after all of these transactions are posted, then the customer incurs overdraft fees.

HSBC charges customers the same $35 fee for each overdraft regardless of the amount of the transaction.  This means that, using high-to-low posting, customers' funds in an account are depleted as quickly as possible, which can lead to overdraft fees.  Customers cannot easily avoid these overdraft fees even if they closely track their income and spending.

Prior to July 1, 2010, HSBC automatically enrolled consumers in its overdraft protection program without giving them the opportunity to opt out of the program.  The Plaintiffs allege that HSBC forced customers to participate in its overdraft program and adopted high-to-low posting for the sole purpose of recovering as many overdraft fees as possible from its customers.

2. HSBC's Account Holder Agreement

The terms of HSBC's checking accounts are contained in a standard account holder

agreement called the "Rules for Deposit Accounts" (the "Rules").  HSBC distributes the Rules to

all customers who open a new HSBC checking account.  The Rules explain that:

> If you write a check for more money than you have in your account or
> against unavailable funds, the Bank may either pay the check, in which
> case you must pay the Bank back promptly, or return it.  The Bank may
> charge you a per item fee as shown on the Terms and Charges Disclosure
> if you write a withdrawal slip or check, make a withdrawal from an
> automated teller machine or other electronic funds facility, (including a
> point of sale terminal) against insufficient funds or against funds
> unavailable for withdrawal.  You[r] account may be debited on the day an
> item is presented, or at such earlier time as notification is received by the
> Bank by electronic or other means, that an item is drawn on your account
> has been deposited for collection in another financial institution.  You
> understand that the Bank reserves the right to pay items into overdraft,
> [and] to impose overdraft fees . . .

(Amended Compl., Exs. A, B at 3).  Under the heading "Payment of Your Items for Your

Account," HSBC states "the Bank generally pays the largest debit items drawn on a

depositor's account first."  HSBC provides no other information or any explanation of

this policy.

B. The Individual Plaintiffs

    1. Jura

The Plaintiff Darek Jura was, at all relevant times, a checking account customer

of HSBC and a resident of New York State.  He opened his checking account with HSBC in the

late 1990s.  During the relevant time period, Jura was issued a check card by HSBC and was

allegedly charged overdraft fees when there were sufficient funds in his account to cover the

transaction at issue.  For example, on August 7, 2008, Jura was charged with four overdraft

charges for a total of $140.  If HSBC had not allegedly manipulated and reordered Jura's

transactions from highest to lowest, Jura allegedly would have incurred only two overdraft fees.

2. <u>Hanes</u>

Hanes was, at all relevant times, a checking account customer of HSBC and a resident of New York State. She alleges that, on May 25, 2010, she was assessed four $35 overdraft fees, totaling $140, based on five debit card transactions that were posted to her account on May 24, 2010.

C. <u>Procedural History</u>

There has been a number of lawsuits brought with regard to HSBC, both in state and federal court, in an almost confusing fashion. Of relevance here, on November 19, 2012, Ofra Levin, 33 Seminary LLC, Binghouse Inc., and Rock View Ventures LLC (the former Levin Plaintiffs) filed the first class action against HSBC in this Court. On December 21, 2012, the Levin Plaintiffs filed their first amended complaint.

Meanwhile, on December 18, 2012, the Plaintiff Darek Jura filed a substantially similar class action against HSBC in this Court. On February 20, 2013, the Plaintiff Leah Hanes filed a substantially similar class action against HSBC in the United States District Court for the Eastern District of Virginia.

On June 5, 2013, the MDL centralized all three actions before this Court. On July 22, 2013, this Court (1) consolidated the three actions for all pretrial purposes; (2) appointed co-interim class counsel; and (3) directed co-interim class counsel to file a consolidated class action complaint within thirty days of the date of that order.

On September 30, 2013, the amended consolidated class action complaint was filed. Based on the above-mentioned allegations, the Plaintiffs assert numerous claims against HSBC for themselves and for a proposed nationwide class and 13 state subclasses.

On behalf of a proposed national class, the Plaintiffs raise claims for breach of contract; breach of the implied covenant of good faith and fair dealing; conversion; and unjust enrichment.

For the 13 state subclasses, the Plaintiffs raise these claims pursuant to the relevant state laws, and in addition, allege the following claims:

On behalf of a proposed New York subclass, the Plaintiff brings a claim for violation of New York General Business Law § 349.

On behalf of a proposed California subclass, the Plaintiffs bring claims for, among other laws, violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; Unfair Competition Law ("UCL"), Cal. Bus. & Prof. §§ 17200, *et seq.*; and False Advertising Law ("FAL"), Cal. Bus. & Prof. §§ 17500, *et seq.*

On behalf of a proposed Virginia subclass, the Plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion and unjust enrichment.

On behalf of a proposed Connecticut subclass, the Plaintiffs bring claims for violation of Connecticut's General Statute §§ 42-110b, *et seq.*

On behalf of a proposed Delaware subclass, the Plaintiffs bring a claim for a violation Delaware Code Annotated Title 6 §§ 2511, *et seq.*

On behalf of a proposed Florida subclass, the Plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, and unjust enrichment.

On behalf of a proposed Illinois subclass, the Plaintiffs bring claims under the Illinois Consumer Fraud Act, 815 ILCS §§ 505/1, *et seq.* and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §§ 510/1, *et seq.*

On behalf of a proposed Maryland subclass, the Plaintiff brings claims under the Maryland Consumer Protection Act, Maryland Code Annotated, Commercial Law §§ 13-301, *et seq.*

On behalf of a proposed New Jersey subclass, the Plaintiffs bring claims under the New Jersey Consumer Fraud Act, New Jersey Statute Annotated §§ 56:8-1, *et seq.*

On behalf of a proposed Oregon subclass, the Plaintiffs bring claims under the Oregon Unlawful Trade Practices Act, ORS §§ 646.605, *et seq.*

On behalf of a proposed Pennsylvania subclass, the Plaintiffs bring claims under the Pennsylvania Unfair Trade Practices and Consumer Fraud Law, 73 Pennsylvania Statute Annotated §§ 202-1, *et seq.*

On behalf of a proposed Washington subclass, the Plaintiffs bring claims under the Washington Consumer Protection Act, RCW §§ 19.86.010, *et seq.*

Finally, on behalf of a proposed District of Columbia subclass, the Plaintiffs bring claims under the District of Columbia Consumer Protection Procedure Act, D.C. Code §§ 28-3901, *et seq.*

On November 1, 2013, the Defendants moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the amended consolidated class action complaint. In addition to naming HSBC as a defendant, the amended consolidated class action complaint names as defendants HSBC USA Inc. and HSBC North America Holdings Inc., entities which HSBC contends have no relation to the named Plaintiffs or their accounts. In this regard, the Plaintiff does not allege anything to the contrary. Thus, the Court dismisses the complaint against HSBC USA Inc. and HSBC North America Holdings Inc.

## II.  DISCUSSION

A.  The Legal Standard on Motion to Dismiss

In deciding Rule 12(b)(6) motions to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); accord Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009).  First, although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; accord Harris, 572 F.3d at 72. Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. Iqbal, 556 U.S. at 679.  Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.; accord Harris, 572 F.3d at 72.

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998).  This has been interpreted broadly to include any document attached to the complaint; any statements or documents incorporated in the complaint by reference; any document on which the complaint heavily relies; and anything of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

B.  Preemption

As an initial matter, HSBC contends that the Plaintiffs' claims are preempted by the NBA and federal regulations promulgated by the Office of the Comptroller of the Currency (the "OCC").  HSBC contends that the Plaintiffs seek to dictate HSBC's practice of posting debit

card transactions to checking accounts and how it discloses its posting practices, and that such claims (1) interfere with HSBC's power as a national bank to receive deposits and engage in the business of banking under 12 U.S.C. § 24 (Seventh); (2) impermissibly seek to regulate bank deposit-taking and operational powers as provided by 12 C.F.R. § 7.4007; and (3) improperly impose conflicting state standards on the establishment of charges and fees and the method of calculating them as provided by 12 C.F.R. § 7.4002. The Plaintiffs counter that the NBA does not preempt state law claims based on contracts, torts, or criminal law, provided those laws do not significantly impair federally authorized deposit-taking powers.

The Supremacy Clause of the United States Constitution states that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Courts have recognized three generalized scenarios where federal law preempts state law: 1) express preemption, where "Congress define[s] explicitly the extent to which its enactments preempt state law"; 2) field preemption, where Congress's regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or where an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and 3) conflict preemption, where state and federal law directly conflict, making it "impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." English v. Gen. Elec. Co., 496 U.S. 72, 78–79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990) (citations omitted); see also CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993) ("Where a state statute conflicts with, or frustrates, federal law,

the former must give way.").  In addition, federal regulations preempt state law with the same

force and effect as the federal statutes under which they are promulgated. <u>Fidelity Fed. Sav. &</u>

<u>Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).

C.  <u>Preemption and National Banks</u>

      "Business activities of national banks are controlled by the National Bank Act (NBA

or Act), 12 U.S.C. § 1 et seq., and regulations promulgated thereunder by [the OCC]." <u>Watters v.</u>

<u>Wachovia Bank, N.A.</u>, 550 U.S. 1, 6, 127 S. Ct. 1559 (2007).  The NBA "vest[s] in nationally

chartered banks[, such as HSBC] enumerated powers and 'all such incidental powers as shall be

necessary to carry on the business of banking.'12 U.S.C. § 24 Seventh." <u>Watters</u>, 550 U.S. at 11,

127 S. Ct. 1559.

      The Supreme Court of the United States has made clear that the NBA and OCC

regulations do not preempt the field of national bank regulation.  <u>See</u> <u>First Nat'l Bank in St. Louis</u>

<u>v. Missouri</u>, 263 U.S. 640, 656, 44 S. Ct. 213, 68 L. Ed. 486 (1924).  Rather, in enacting the

NBA, Congress created a "mixed state/federal regime[] in which the Federal Government

exercises general oversight while leaving state substantive law in place." <u>Cuomo v. Clearing</u>

<u>House Assn., L.L.C.</u>, 557 U.S. 519, 519, 129 S. Ct. 2710, 174 L. Ed. 2d 464 (2009).  "[F]ederal

control shields national banking from unduly burdensome and duplicative state regulation."

<u>Watters</u>, 550 U.S. at 11, 127 S. Ct. 1559.  The Supreme Court has "interpret[ed] grants of both

enumerated and incidental 'powers' to national banks as grants of authority not normally limited

by, but rather ordinarily pre-empting, contrary state law." <u>Barnett Bank of Marion County, N.A.</u>

<u>v. Nelson</u>, 517 U.S. 25, 32, 16 S. Ct. 1103, 134, L. Ed. 2d 237 (1996).  Nonetheless, "[f]ederally

chartered banks are subject to state laws of general application in their daily business to the

extent such laws do not conflict with the letter or the general purposes of the NBA." <u>Watters</u>, 550 U.S. at 11, 127 S. Ct. 1559.

Regulations enacted by the OCC, which is the agency responsible for regulating national banks, can also preempt conflicting state law. "OCC oversees the operations of national banks and their interactions with customers." <u>Watters</u>, 550 U.S. at 11, 127 S. Ct. 1559. Federal regulations, such as those promulgated by the OCC, "have no less pre-emptive effect than federal statutes." <u>Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L.Ed.2d 664 (1982). "Congress has expressly recognized the OCC's power to preempt particular state laws by issuing opinion letters and interpretive rulings, subject to certain notice-and-comment procedures." <u>Wachovia Bank, N.A. v. Burke</u>, 414 F.3d 305, 314 (2d Cir. 2005).

D.  <u>OCC Regulation of Debit Accounts</u>

Pursuant to OCC regulations, "[a] national bank may receive deposits and engage in any activity incidental to receiving deposits." 12 C.F.R. § 7.4007(a). "A national bank may exercise its deposit-taking powers without regard to state law limitations concerning . . . (2) [c]hecking accounts; [and] (3) [d]isclosure requirements." 12 C.F.R. § 7.4007(b). However, "[s]tate laws on the[] subjects [of contracts and torts] are not inconsistent with the deposit-taking powers of national banks to the extent consistent with the decision of the Supreme Court in [<u>Barnett</u>]." 12 C.F.R. § 7.4007(c).

OCC regulations also authorize national banks to "charge [their] customers noninterest fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). Furthermore, "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound business principles." 12 C.F.R.§ 7.4002(b)(2).

The OCC has also recognized that:

> The process by which a bank honors overdraft items is typically part of the Bank's administration of a depositor's account. Creating and recovering overdrafts have long been recognized as elements of the discretionary deposit account services that banks provide. Where a customer creates debits on his or her account for amounts in excess of the funds available in that account, a bank may elect to honor the overdraft and then recover the overdraft amount as part of its posting of items and clearing of the depositor's account. These activities are part of or incidental to the business of receiving deposits.

OCC Interpretive Letter # 1082, 2007 WL 5393636, at *2 (May 17, 2007)(internal citations omitted).

The OCC has implicitly permitted national banks to utilize high-to-low posting for checks in certain circumstances. The OCC stated in an interpretive letter that national banks' power to assess fees under 12 C.F.R. §7.4002(a):

> necessarily includes the authorization to decide how they are computed . . . . The number of items presented against insufficient funds is determined by the order of posting a bank uses. For example, the high-to-low posting order . . . will result in the [b]ank's payment of the depositor's largest checks first. If the depositor has written a number of checks against insufficient funds that are presented on the same day, the high-to-low posting order may result in a greater number of checks being presented against insufficient funds than if the [b]ank used a different posting order.

OCC Interpretive Letter # 916, 2001 WL 1285359, at *2 (May 22, 2001). The OCC concluded that "the bank may therefore post checks in the order it desires." Id. at *4.

Further, the Court notes that the OCC's interpretations of its own regulations are controlling unless "plainly erroneous or inconsistent with the regulation[s]." Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997).

E.  As to Whether the Plaintiffs' Claims are Preempted

This Court's inquiry is limited to whether the Plaintiffs' claims, as alleged, more than "incidentally affect the exercise of national banks' deposit taking powers."  The Court finds that they do not and are therefore not preempted.

In analyzing preemption, the Court asks whether the state law "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." Barnett, 517 U.S. at 33, 116 S. Ct. 1103.

Levin v. HSBC Bank USA, N.A., Index No. 650562/2011, 2012 N.Y. Misc. LEXIS 6062, 2012 N.Y. Slip Op. 33164(U) (Sup. Ct. N.Y. County June 26, 2012)(Bransten, J.), a state court class action arising out if substantially similar, if not identical, alleged misconduct, is instructive.  There, the court held that the plaintiffs' New York state claims were not preempted by federal banking law.  In particular, the Court concluded that "[t]he New York contract, tort and consumer protection laws upon which the Plaintiffs base[d] their claims do not prohibit any behavior required by the NBA or the OCC regulations.  Nor do such state laws require national banks to do anything prohibited by federal law.  National banks can thus simultaneously comply with the state and federal laws at issue." 2012 N.Y. Misc. LEXIS 6062, at *19.

Further, federal courts addressing this type of alleged misconduct have declined to hold that state claims, based on both statutory and common law, are preempted by the NBA or OCC regulations.  For example, in In re Checking Acct. Overdraft Litigation, 694 F. Supp. 2d 1302 (S.D. Fla. 2010), the plaintiffs, as here, did not challenge a bank's right to charge overdraft fees. Rather, the plaintiffs challenged the bank's abuse of its discretion to delay debiting certain payments.  The Court recognized that a bank has the right to charge overdraft fees, but that it is not authorized "to ignore general contract or tort law." Id. at 1313; Trombley v. Bank of Am.

Corp., 715 F. Supp. 2d 290, 296 (D.R.I. 2010) ("The state laws upon which plaintiffs base their claim that [Bank of America] violated the duty of good faith and fair dealing are not preempted and the claim will not be dismissed."); Baldanzi v. WFC Holdings Corp., No. 07 Civ. 9551(LTS)(GWG), 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."); Jefferson v. Chase Home Finance, No. C 06-6510, 2008 WL 1883484, at *12-14 (N.D. Cal. Apr. 29, 2008) (holding that the use of the general state consumer protection laws to bring advertising-based claims against a national bank was not preempted by the NBA or OCC regulations); Great W. Res., LLC v. Bank of Ark., Nat'l Ass'n, No. 05–5152, 2006 WL 626375, at *3-4 (W.D. Ark. Mar. 13, 2006) (declining to dismiss breach of contract, Arkansas Deceptive Trade Practices Act, conversion, and breach of implied covenant of good faith claims on grounds of preemption); but see Martinez v. Wells Fargo Bank, N.A. et al., No. C-06-03327, 2007 WL 963965, at *8 (N.D. Cal. Mar. 30, 2007) (holding that OCC regulations giving national banks discretion to set fees conflicted with and, therefore, preempted the plaintiffs' state law claims against defendant national banks for charging certain real estate transaction fees).

In addition, "[t]hese are state laws of general application that do not vitiate the purposes of the NBA, and banks could comply with both the NBA, OCC regulations[,] and state laws if they refrained from engaging in the criticized posting procedures." In re Checking Acct. Overdraft Litigation, 694 F. Supp. 2d at 1313. "A bank could follow both the requirements of sound banking judgment outlined in Section 7.4007 and good faith; these princip[les] are not in

irreconcilable conflict." Id. Accordingly, the Court finds that the Plaintiffs' state law claims are not preempted by federal law.

Indeed, with respect to the California statutory claims under the UCL – HSBC's position – "that § 7.4007(b)(2) dictates preemption - is conclusively undercut by the OCC itself, which, far from concluding that the Unfair Competition Law is expressly preempted under its regulations, 'has specifically cited [the California Unfair Competition Law] in an advisory letter cautioning banks that they may be subject to such laws that prohibit unfair or deceptive acts or practices.'" Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 726 (9th Cir. 2012), quoting Martinez v. Wells Fargo Home Mortg., Inc., 598 F.3d 549, 553 (9th Cir. 2010)(quotation marks omitted).

That advisory letter warns that the "consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation." OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *1 (Mar. 22, 2002). The OCC recognizes that state laws that withstand preemption "typically do not regulate the manner or content of the business of banking authorized for national banks, but rather establish the legal infrastructure that makes practicable the conduct of that business." Bank Activities and Operations, 69 Fed. Reg. 1904, 1913 (Jan. 13, 2004). "By prohibiting fraudulent business practices, the Unfair Competition Law does exactly that – it establishes a legal infrastructure." Gutierrez, 704 F.3d at 727.

HSBC attempts to distinguish In re Checking Acct. Overdraft Litigation on the basis that it relied on a later-reversed district court decision in Gutierrez v. Wells Fargo Bank, N.A., 730 F. Supp. 2d 1080 (N.D. Cal. Sept. 11, 2008). The Gutierrez case involved Wells Fargo's alleged (1)

16

policy of posting debit transactions from high-to-low so as to maximize overdraft charges; (2) failure to disclose its policy to consumers; and (3) misleading statements to the effect that debit transactions would be posted in the order they made by the consumer. The district court found that the NBA did not preempt the plaintiffs' UCL claims. The district court permanently enjoined Wells Fargo's use of high-to-low posting. The court ordered Wells Fargo to either reinstate a low-to-high posting method or use a chronological posting method (or some combination of the two methods) for debit-card transactions. With respect to disclosures, the court required "all agreements, disclosures, websites, online banking statements, and promotional materials" to conform to the new posting system. Finally, the court ordered $203 million in restitution because it found that Wells Fargo acted in bad faith when it decided to post debit-card transactions in high-to-low order.

The Ninth Circuit reversed in part and affirmed in part. In relevant part, the Ninth Circuit held that 12 C.F.R. §7.4002(b) preempted the plaintiffs' challenge to Wells Fargo's high-to-low posting order. Citing the OCC letters interpreting §7.4002, the court reasoned that "federal law authorizes national banks to establish a posting order as part and parcel of setting fees, which is a pricing decision." <u>Gutierrez</u>, 704 F.3d at 725. The Ninth Circuit determined that the "district court is not free to disregard the OCC's determinations of what constitutes a legitimate pricing decision, nor can it apply state law in a way that interfere[d] with this enumerated and incidental power of national banks." <u>Id.</u>

On the other hand, the Ninth Circuit rejected Wells Fargo's argument that the allegation regarding misleading statements was preempted by its deposit-taking power. Observing that the NBA and OCC provisions do not regulate deceptive statements regarding a bank's chosen posting method, the Ninth Circuit held that California's prohibition on misleading statements did

not significantly interfere with the bank's ability to offer checking account services, choose a posting method, or calculate fees. See id. at 727.

Here, unlike in Gutierrez, the Plaintiffs do not seek a blanket prohibition on high-to-low posting. Instead, the Plaintiffs seek recovery based on HSBC's alleged manipulation of their debit and checking charges. In this regard, "[a] desire to limit a bank's authority to charge a fee is not synonymous with a desire to hold a bank liable for the bad-faith manner in which an account is reorganized to justify a larger number of overdraft charges." In re Checking Acct. Overdraft Litigation, 797 F. Supp. 2d at 1322.

Similarly, HSBC contends that the District Court in In re Checking Acct. Overdraft Litigation improperly relied on White v. Wachovia Bank, N.A., 563 F. Supp. 2d 1358 (N.D. Ga. 2008). White was based on facts similar to this case, and also alleged that the defendant banks were imposing overdraft fees "even when there are sufficient funds in the account to cover the transaction." Id. at 1361. Similar to HSBC, the defendant in White moved to dismiss on several grounds, including preemption by the NBA. The White court rejected that argument, finding that the plaintiffs' claims sounded in tort and contract and did "not more than incidentally affect Wachovia's deposit-taking powers." Id. at 1367. In drawing that conclusion, the court noted that, although the allegations implicated the defendant's "largest-to-smallest transaction posting policy, [they] more importantly claim[] that Wachovia's policy allows the routine imposition of an overdraft fee for transactions that do not result in an actual overdraft." Id. at 1368. HSBC insists that no such allegation is present here. However, the White court did not foreclose as preempted a challenge to a bank's abuse of a high-to-low transaction posting policy, but rather focused on "[t]he primary basis for Plaintiffs' claims[ ] that Wachovia maintain[ed] a policy of

charging overdraft fees even where there are funds in an account sufficient to cover a transaction." Id. at 1368.

That said, the court stated that, "[t]o the extent Plaintiffs assert that Wachovia does not adequately disclose its check-posting policy, those claims may well be preempted." Id. at 1369 n. 15.  Thus, in this case, the Court finds that inasmuch as the Plaintiffs seek to impose liability on HSBC for the bank's failure to sufficiently disclose its posting method, that argument is preempted. See Gutierrez, 704 F.3d 712, 726.  "A national bank may exercise its deposit-taking powers without regard to state law limitations concerning," among other things, "disclosure requirements." 12 C.F.R. § 7.4007(b)(3).

It bears mentioning that this Court does not pass upon whether HSBC's decision to resequence the posting order falls within the OCC's definition of a pricing decision authorized by federal law or whether HSBC's internal decision-making processes regarding posting orders comply with "safe and sound banking principles" under §7.4002(b)(2).  "Again, the Court's only inquiry at this stage is whether the state law claims, as alleged, more than incidentally affect the exercise of the banks' deposit taking power.  The Plaintiffs alleged claims are not that banks lack the right to charge overdraft fees as part of their deposit-taking powers.  Instead, the Plaintiffs attack the allegedly unlawful manner in which the banks operate their overdraft programs to maximize fees at the expense of consumers." In re Checking Acct. Overdraft Litigation, 694 F. Supp. 2d at 1313.  The Court finds that, "[a]t this stage, these allegations do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted." Id.

F.  Whether the Plaintiffs State a Claim Upon which Relief Can be Granted

HSBC contends that, even if the Plaintiffs' state law claims are not preempted by federal

law, those claims fail for separate and additional reasons. HSBC first asserts that the Plaintiffs' claims for states other than New York and California must fail because the Plaintiffs allege no contacts with these other states.

To the extent this argument can be construed as challenging the Court's personal jurisdiction over HSBC, the Court finds this argument unavailing. The Court notes that the amended consolidated class action complaint alleges that HSBC operates more than 475 branches throughout the United States, including in New York and California, but also Connecticut, Washington, D.C., Florida, New Jersey, Pennsylvania, Maryland, Virginia, Delaware, Illinois, Oregon, and Washington State. (Amended Consol. Compl. ¶ 30.)

However, to the extent this argument can be construed as challenging the named Plaintiffs' standing to pursue such state law claims, the question deserves more attention. Whether a Plaintiff has Article III standing is a threshold issue that "determine[s] the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). "To satisfy the irreducible constitutional minimum of [Article III] standing, a plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012) (citations and internal quotation marks omitted). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Id. (citations and internal quotation marks omitted).

These rules are no less true for plaintiffs representing putative classes. Indeed, "'[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and

which they purport to represent.'" Id. at 64 (quoting Lewis v. Casey, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (citations, internal quotation marks, and alterations omitted)).

Further, the Second Circuit has made clear that Article III standing is generally a prerequisite to class certification. Oklahoma Police Pension & Ret. Sys. v. U.S. Bank Nat. Ass'n, 11 CIV. 8066 (JGK), 2013 WL 6508843, at *5 n. 3 (S.D.N.Y. Dec. 12, 2013)(citing Mahon and noting the narrow "exception" to this rule applies in cases in which "the Article III concerns would arise only if the Court affirmed class certification.")(internal quotation marks omitted).

However, "[a]t this preliminary stage of the litigation, the only relevant standing inquiry is that of the named plaintiffs." In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig., 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010); see also Comer v. Cisneros, 37 F.3d 775, 788 (2d Cir. 1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim.")(citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 263-64, 97 S. Ct. 555, 562 (1977)).

In this case, the Court finds that the Plaintiffs may only assert a state claim if a named plaintiff resides in, does business in, or has some other connection to that state. Simington v. Lease Fin. Grp., LLC, 10 CIV. 6052 (KBF), 2012 WL 651130, at *9 (S.D.N.Y. Feb. 28, 2012)("Where plaintiffs themselves do not state a claim under their respective state's consumer statutes, however, they do not have standing to bring claims under other state statutes – even where they are named plaintiffs in a purported class action."); In re Checking Account Overdraft Litig., ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to the claim."); Parks v. Dick's Sporting Goods, Inc., 05-CV-6590 (CJS), 2006 WL 1704477, at *2 (W.D.N.Y. June 15, 2006)("the Court finds that the plaintiff, Daniel Parks, lacks standing to assert state-law claims arising under the laws of states

other than New York, since he was never employed by defendant anywhere other than New York.")

To hold otherwise "would allow Plaintiff to engage in lengthy and expensive discovery with respect to alleged violations of state laws when the Court cannot be certain that any individual suffered an injury under those laws." Smith v. Pizza Hut, Inc., No. 09-CV-01632 (CMA)(BNB), 2011 WL 2791331, at *9 (D. Colo. July 14, 2011); In Re Wellbutrin, 260 F.R.D. 143, 155 (E.D. Pa. 2009)(finding that certifying a class action without named plaintiffs who have standing to assert each claim would "allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.").

Rather, this Court "finds more persuasive the numerous cases holding that named plaintiffs lack standing to bring claims on behalf of a class under the laws of states where the named plaintiffs have never lived or resided." Smith, 2011WL 2791331, at *9; Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987) (finding that "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."); In Re Potash Antitrust Litig., 557 F. Supp. 2d 907, 924 (N.D. Ill. 2009) (dismissing claims under the laws of states where the plaintiffs were not residents for lack of standing because the plaintiffs did not allege personal injuries in those states); In Re Wellbutrin, 260 F.R.D. at 157 (finding that the "allegations present no facts that would connect injuries specific to the plaintiffs, as opposed to injuries against competitors and purchasers nationwide, to any cause arising in states where no named plaintiff is located . . ."); Self v. TPUSA, Inc., No. 2:08–cv–395, 2009 WL 273326, at *2 (D. Utah Feb.4, 2009) (unpublished) (holding that the case may only proceed "based on the laws of the jurisdictions in

which their claims are based."); <u>Thomas v. Metro. Life Ins. Co.</u>, 540 F. Supp. 2d 1212, 1226 (W.D. Okla. 2008) ("[T]he court's analysis requires dismissal of any state law claims alleged under the laws of any states where a particular named plaintiff is not a resident."); <u>but see</u> <u>Blessing v. Sirius XM Radio Inc.</u>, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010)("The class certification process will address whether named plaintiffs' injuries are sufficiently similar to those of the proposed class to justify a nationwide class action, and the answer to that question will determine whether there are plaintiffs with standing to bring claims under the laws of states in which no currently-named plaintiff resides.").

For the foregoing reasons, the Court finds that that named Plaintiffs lack standing to bring claims under state laws to which Plaintiff have not been subjected – that is, those states aside from California and New York. Moreover, the Court notes that "if Plaintiff seeks leave to amend the [amended consolidated class action complaint] to add a named representative from each state, the Court, without prejudging the question, notes the obvious fact that it would be difficult for the Court to adjudicate claims under the laws of all of the states listed in the [hypothetical second amended consolidated class action complaint], especially in light of the discrepancies between the states' laws." <u>Smith</u>, 2011 WL 2791331, at *9.

1. New York and California Common Law Claims

In this section, the Court addresses whether the Plaintiffs state a cause of action for their claims under New York and California law. Specifically, the Court will address the causes of action on a claim-by-claim basis, beginning with the common law claims for (i) breach of contract; (ii) implied covenant of good faith and fair dealing; (iii) unjust enrichment; and (iv) conversion.

i.    Breach of Contract

HSBC asserts that the Plaintiffs' breach of contract claims must fail because the Plaintiffs do not allege a breach of an actual term of the contract. The Court agrees and dismisses those claims. See e.g., Wolff v. Rare Medium Inc., 171 F. Supp. 2d 354, 358-59 (S.D.N.Y. 2001) (granting dismissal of a breach of contract claim where the plaintiff failed to identify the provision the defendant allegedly breached); accord Schnelke v. JP Morgan Chase Bank as successor in interest to Washington Mut., No. 2:09-CV-03119 (MCE)(KJN), 2010 WL 2546100, at *2-3 (E.D. Cal. June 23, 2010) (same).

ii.    Implied Covenant of Good Faith and Fair Dealing

Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. Encompassed within the implied obligation of each promisor to exercise good faith are "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289 (1995) (internal citations and quotation marks omitted). "Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain." Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York, , 198, 886 N.E.2d 127 (2008). "The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." Dalton, 87 N.Y.2d at 389, 663 N.E.2d 289 (internal quotation marks omitted).

The Rules state that HSBC "generally pays the largest debit items drawn on a depositor's account first." "Where the contract contemplates the exercise of discretion, this pledge includes a

promise not to act arbitrarily or irrationally in exercising that discretion." <u>Dalton</u>, 87 N.Y.2d at 389, 663 N.E.2d 289

The Plaintiffs maintain that HSBC breached the covenant of good faith and fair dealing implicitly contained in the Rules by implementing its overdraft policy in an abusive manner. HSBC counters that it could not have acted in bad faith in posting debit transactions from high to law because the Rules explicitly granted it the authority to do so. The Court agrees with the Plaintiffs.

In <u>Levin</u>, 2012 N.Y. Misc. LEXIS 6062, Justice Bransten held that the plaintiffs sufficiently alleged a cause of action for breach of the implied covenant of good faith and fair dealing based on substantially identical allegations.

The Court also takes note of the district court decision in <u>Gutierrez</u>, 622 F. Supp. 2d 946, 954, decided under California law. There, the plaintiff accused Wells Fargo of posting larger withdrawals to his checking account before smaller ones so as to maximize the number of overdraft penalties the bank could charge. On a motion for summary judgment, Wells Fargo argued that the consumer account agreement between Wells Fargo and the plaintiff expressly permitted the bank to post items to the plaintiff's checking account "in any order the bank chooses," subject to law. <u>Id.</u> Nonetheless, the court refused to grant summary judgment to the bank because the bank's discretionary authority was still subject to the covenant of good faith and fair dealing. In that court's view, the contract "language d[id] nothing more than give discretion to the bank and once, again, that measure of discretion must be exercised subject to good faith and fair dealing and not so as to maximize bank revenue and to penalize customers as much as possible." <u>Id.</u>

In light of these persuasive holdings under relatively comparable circumstances, the Court finds that that Plaintiffs' allegations state plausible claims for breach of the implied covenant of good faith and fair dealing under New York law and California law.

iii.   Conversion

In New York, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." <u>Colavito v. New York Organ Donor Network, Inc.</u>, 8 N.Y.3d 43, 49-50, 860 N.E.2d 713 (2006).  "Money, specifically identifiable and segregated, can be the subject of a conversion action." <u>Manufacturers Hanover Trust Co. v. Chem. Bank</u>, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704 (1st Dep't 1990).  Plaintiffs need not show that they hold title to the property in question.  They need only establish "(1) [a] possessory right or interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." <u>Colavito</u>, 8 N.Y.3d at 50, 860 N.E.2d 713 (citations and quotation marks omitted).

"New York applies a three-year statute of limitations for conversion." <u>St. John's Univ., New York v. Bolton</u>, 757 F. Supp. 2d 144, 179 (E.D.N.Y. 2010), citing N.Y. C.P.L.R. § 214(3).  HSBC asserts that any claim for conversion on behalf of Jura is untimely under C.P.L.R § 214(3) as the alleged overdraft fees occurred on August 6-7, 2008, more than three years prior to the filing of the amended consolidated class action complaint.  The Plaintiffs counter that these dates are just examples of overdraft occurrences and that some overdrafts occurred after these dates.  Alternatively, the Plaintiffs argue that the New York conversion claim was tolled under C.P.L.R. 205(a) by the state court action before Justice Bransten.  On these assertions, the Court agrees with HSBC.

First, the Plaintiffs did not mention overdraft fees after August 6-7, 2008 in the amended consolidated class action complaint. "It is a basic principle that a complaint may not be amended by the plaintiff's brief filed in opposition to a motion to dismiss." <u>Telsat v. Entm't & Sports Programming Network</u>, 753 F. Supp. 109, 113 n.4 (S.D.N.Y. 1990)(collecting cases). Second, absent actual identification of the dates of such later alleged overdrafts, the Court declines to find that the statute of limitations for the conversion claim began to run at some point after August 6-7, 2008. The Court notes that the dates of such transactions could have been plead because they would presumably be within the knowledge of Jura, the New York-based Plaintiff.

Second, the Plaintiffs' reliance on New York's tolling statute, C.P.LR. § 205(a) ("Section 205(a)") is misplaced. Section 205(a) provides "that when an action is dismissed on grounds <u>other than voluntary discontinuance</u>, lack of personal jurisdiction, neglect to prosecute, or a final judgment on the merits, the plaintiff may bring a new action within six months of the dismissal, even though the action would otherwise be barred by the statute of limitations." <u>Marrero v. Crystal Nails</u>, 978 N.Y.S.2d 257, 258, 2013 N.Y. Slip Op. 08599 (2d Dep't 2013)(emphasis added). Here, Jura in fact voluntarily dismissed his state law claims, as confirmed by Judge Bransten's August 22, 2013 order, which found a previously filed motion moot "due to the voluntary discontinuance of Darek Jura's claims." (Reply Mem, Exh. A.) For these reasons, the Plaintiffs' claims under New York law for conversion are dismissed as time-barred.

However, even if these claims were not time-barred, the Court would find that they fail on the merits. "Money deposited in a general account at a bank does not remain the property of the depositor. Upon deposit . . . the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it. . . ." <u>Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.</u>, 481 F. App'x 622, 627 (2d Cir. 2012)(applying New York

law)(citations and quotation marks omitted). Thus, depositors like the Plaintiffs cannot bring a conversion cause of action against HSBC, their bank, as the funds deposited therein "are not sufficiently specific and identifiable, in relation to the bank's other funds, to support" such a claim. <u>Fundacion Museo de Arte Contemporaneo de Caracas v. CBI–TDB Union Bancaire Privee</u>, 160 F.3d 146, 148 (2d Cir. 1998) (per curiam). Accordingly, the Plaintiffs' claims under New York law for conversion are dismissed.

In California, the elements of a conversion claim include a plaintiff's ownership or right to possession of property; and the defendant's wrongful act or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff. <u>Burlesci v. Petersen</u>, 68 Cal. App.4th 1062, 1066, 80 Cal. Rptr. 2d 704 (1998). As in New York, "[t]he relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor. A bank may not be sued for conversion of funds deposited with the bank." <u>Gutierrez</u>, 622 F. Supp. 2d at 956. "Therefore, when funds are deposited, title to those funds passes immediately to the bank. Since the money thus becomes the literal property of the bank, it cannot be tortiously converted by the bank." <u>Crocker-Citizens Nat'l Bank v. Control Metals Corp.</u>, 566 F.2d 631, 637-38 (9th Cir. 1978). Accordingly, the Plaintiffs' claims under California law for conversion are dismissed.

iv.   <u>Unjust Enrichment</u>

"Under both California and New York law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties." <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1167 (9th Cir. 1996); <u>Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) ("Unjust enrichment is a quasi-contract claim, and the existence of a valid and enforceable

written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the subject matter.") (citation, quotation marks, and alterations omitted). Here, the Rules define the rights of the parties.

The Plaintiffs insist that they may plead both breach of contract and unjust enrichment claims in the alternative, and, citing <u>Plumitallo v. Hudson Atl. Land Co.</u>, LLC, 74 A.D.3d 1038, 1039, 903 N.Y.S.2d 127 (2d Dep't 2010), maintain that they need not elect their remedies at this stage of the litigation. However, <u>Plumitallo</u> held that a plaintiff would not be required to elect his or her remedies only where, unlike here, "there is a bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue." <u>Id.</u> Absent those circumstances, the Court dismisses the Plaintiffs' claim for unjust enrichment under New York law and California law. <u>See</u> <u>Levin</u>, 2012 N.Y. Misc. LEXIS 6062, at *34 (dismissing substantially identical unjust enrichment claims under New York law).

2. <u>New York and California Statutory Claims</u>

i. <u>Deceptive Business Practices Under General Business Law § 349</u>

"To state a claim under Section 349 [of the General Business Law], a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." <u>Spagnola v. Chubb Corp.</u>, 574 F.3d 64, 74 (2d Cir. 2009).

As the Court held with regard to the New York conversion laws, the Court finds that the Plaintiffs' Section 349 claims are time-barred by the three-year statute of limitations provided by in C.P.L.R. § 214. However, the Section 349 claims are dismissed without prejudice because, in the Court's view, it is possible that the Plaintiffs may be able to identify later overdraft fees assessed against Jura.

ii.     The California Statutory Claims

As noted above, the amended consolidated class action complaint alleges certain California statutory claims under the CLRA, FAL, and UCL.

"Plaintiffs must satisfy the heightened pleading standards for fraud under Rule 9(b) with respect to all of their UCL, FAL, and CLRA claims." <u>Kane v. Chobani, Inc.</u>, 12-CV-0242 (LHK), 2013 WL 5289253, at *7 n.4 (N.D. Cal. Sept. 19, 2013). Even if "fraud is not a necessary element of a [particular] claim," Rule 9(b) will apply if the plaintiff has "allege[d] a unified course of fraudulent conduct and rel[ied] entirely on that course of conduct as the basis of [the] claim." <u>Vess v. Ciba–Geigy Corp. USA</u>, 317 F.3d 1097, 1103 (9th Cir. 2003). In such a case, the claim "is said to be 'grounded in fraud,'" <u>id.</u>, and must be pleaded with particularity, <u>see</u> <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1127 (9th Cir. 2009) (holding that, where "TAC allege[d] a unified fraudulent course of conduct," the claims were "grounded in fraud" and the "entire complaint" had to be pleaded "with particularity").

### a.   The CLRA

The Court first considers the Plaintiffs' claim under the CLRA. HSBC contends that the CLRA only creates a cause of action for a plaintiff on transactions involving "goods or services." The CLRA defines "goods," in relevant part, as "tangible chattels bought or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1761(a). "Services" are defined as "work, labor, and services for other than a commercial business use, including services furnished in connection with the sale or repair of goods." <u>Id.</u> § 1761(b).

"Keying on these definitions and the legislature's removal of the words 'money' and 'credit' from the definition of 'consumer' in the phrase 'by purchase or lease, any goods, services, money, or credit' prior to the enactment of the CLRA, several courts have held that the

ii.     The California Statutory Claims

As noted above, the amended consolidated class action complaint alleges certain California statutory claims under the CLRA, FAL, and UCL.

"Plaintiffs must satisfy the heightened pleading standards for fraud under Rule 9(b) with respect to all of their UCL, FAL, and CLRA claims." <u>Kane v. Chobani, Inc.</u>, 12-CV-0242 (LHK), 2013 WL 5289253, at *7 n.4 (N.D. Cal. Sept. 19, 2013). Even if "fraud is not a necessary element of a [particular] claim," Rule 9(b) will apply if the plaintiff has "allege[d] a unified course of fraudulent conduct and rel[ied] entirely on that course of conduct as the basis of [the] claim." <u>Vess v. Ciba–Geigy Corp. USA</u>, 317 F.3d 1097, 1103 (9th Cir. 2003). In such a case, the claim "is said to be 'grounded in fraud,'" <u>id.</u>, and must be pleaded with particularity, <u>see</u> <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1127 (9th Cir. 2009) (holding that, where "TAC allege[d] a unified fraudulent course of conduct," the claims were "grounded in fraud" and the "entire complaint" had to be pleaded "with particularity").

### a.   The CLRA

The Court first considers the Plaintiffs' claim under the CLRA. HSBC contends that the CLRA only creates a cause of action for a plaintiff on transactions involving "goods or services." The CLRA defines "goods," in relevant part, as "tangible chattels bought or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1761(a). "Services" are defined as "work, labor, and services for other than a commercial business use, including services furnished in connection with the sale or repair of goods." <u>Id.</u> § 1761(b).

"Keying on these definitions and the legislature's removal of the words 'money' and 'credit' from the definition of 'consumer' in the phrase 'by purchase or lease, any goods, services, money, or credit' prior to the enactment of the CLRA, several courts have held that the

CLRA does not apply to credit card agreements or loans." Hawthorne v. Umpqua Bank, 11-CV-06700 (JST), 2013 WL 5781608, at *10 (N.D. Cal. Oct. 25, 2013). For example, in Gutierrez, the District Court granted summary judgment in favor of Wells Fargo on the plaintiffs' CLRA claim as follows:

> Plaintiffs have not identified the purported good or service here. Indeed, plaintiffs likely bought goods and services in many instances with the money extended because of overdrafts. But not from the bank. Much like credit cards provide an extension of credit, an overdraft provides an extension of money. Plaintiffs cite no authority showing that the bank's action was undertaken "in a transaction intended to result or which results in the sale or lease of *goods or services*."

622 F. Supp. 2d at 957 (quoting Cal. Civ. Code § 1770); see also In re Checking Account Overdraft Litig., 694 F. Supp. 2d at 1326 ("overdrafts and overdraft fees do not fall within the California CLRA's definition of a 'good' or 'service.'"); compare Hawthorne, 2013 WL 5781608, at *10-11 (holding that debit cards, rather than checking accounts, are a "service" for purposes of the CLRA). Based on these opinions regarding the meaning of "goods or services" under the CLRA, the Court dismisses the Plaintiffs' CLRA claims.

### b. The FAL

The FAL proscribes false advertising – i.e., the use of "untrue or misleading" statements in selling real or personal property or personal services. To establish a FAL claim, a plaintiff must show that members of the public are likely to be deceived." Haas Automation, Inc. v. Denny, 2:12-CV-04779 (CBM), 2013 WL 6502876, at *12 (C.D. Cal. Dec. 4, 2013).

Here, the Court finds that the Plaintiff's claims under the "fraudulent" prong of the FAL are sufficient to state a cause of action. The Plaintiffs allege that consumers would not understand HSBC's statements to mean that HSBC would hold transactions made over several days and then post them from high-to-law. Rather, they allege, a reasonable consumer would expect to be able to accurately track his or her own expenditures to avoid overdraft charges. The

Plaintiffs adequately allege that this is nearly impossible given HSBC's overdraft and posting policies.

### c. The UCL

Turning to the Plaintiffs' UCL claims, Section 17200 of the California Business and Professions Code prohibits business acts or practices that are "fraudulent," "unfair," or "unlawful." Each of these three restrictions constitutes a separate and independent claim. Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999) (citations omitted).

With respect to the "fraudulent" prong of the UCL, a cause of action for fraudulent business acts under section 17200 is distinct from a common law fraud claim. Under section 17200, a plaintiff need not show reliance to state a claim for fraudulent business acts. Klein v. Earth Elements, 59 Cal. App. 4th 965, 970, 69 Cal. Rptr. 2d 623 (1997). A plaintiff need only allege that the public is likely to be deceived by the alleged business acts. Id. In this respect, a claim under the UCL is similar to a claim under Section 349 of the New General Business Law. Stutman v. Chem. Bank, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) ("[R]eliance is not an element of a section 349 claim.").

"The question whether consumers are likely to be deceived is a question of fact that can be decided on a [motion to dismiss] only if the facts alleged in the complaint, and facts judicially noticed, compel the conclusion as a matter of law that consumers are not likely to be deceived." Chapman v. Skype Inc., 220 Cal. App. 4th 217, 226-27, 162 Cal. Rptr. 3d 864, 872 (2013). With that principle in mind, in this case, as with the Plaintiffs' claims under the FAL, the Court concludes that the Plaintiffs have sufficiently plead a cause of action under the "fraudulent" prong of the UCL. See Gutierrez, 730 F. Supp. 2d at 1127-1128 (finding, after a bench trial,

"fraudulent" conduct under Section 17200 on the basis that Wells Fargo's written agreements failed to adequately disclose the Bank's posting and sequencing practices).

"The UCL also creates a cause of action for a business practice that is "unfair" even if not specifically proscribed by some other law." Fraley v. Facebook, Inc., 830 F. Supp. 2d 785, 812 (N.D. Cal. 2011). Some appellate state courts have applied the balancing test under South Bay Chevrolet v. Gen. Motors Acceptance Corp., 72 Cal. App. 4th 861, 85 Cal. Rptr. 2d 301 (1999), which requires the Court to "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." 72 Cal. App. 4th at 886-87, 85 Cal. Rptr. 2d 301; see McKell v. Wash. Mut., Inc., 142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2006). "The balancing test required by the unfair business practice prong of section 17200 is fact intensive and is not conducive to resolution at the [motion to dismiss] stage." Progressive W. Ins. Co. v. Yolo Cnty. Superior Court, 135 Cal. App. 4th 263, 287, 37 Cal. Rptr. 3d 434, 453 (2005).

Other courts have required a plaintiff to show that a practice violates public policy as declared by "specific constitutional, statutory or regulatory provisions." Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 1260-61, 39 Cal. Rptr. 3d 634 (2006). "The unfairness prong must be tethered to some legislative policy; otherwise the courts will roam across the landscape of business practices picking and choosing which they like and which they dislike." Fields v. Wise Media, LLC, 12-05160 (WHA), 2013 WL 3187414, at *6 (N.D. Cal. June 21, 2013).

"Regardless of which of the first two tests endorsed by the Ninth Circuit is employed, Plaintiffs have stated a claim for unfair conduct under the UCL." Fraley, 830 F. Supp. 2d at 813. Under the balancing test, the facts and evidence have yet to be adduced. Whether a $35 overdraft fee is an insubstantial injury strikes the Court as a factual question. This relatively

small individualized amount need not necessarily be considered "insubstantial," lest corporations be incentivized to engage in "unfair" business practices that, while beneficial to them, escape liability because the resulting harm is sufficiently spread out over members of the public.

Similarly, the Court finds that the Plaintiffs have adequately plead that the application of HSBC's posting and sequencing policies violate public policy. The "tethering" requirement is satisfied by the Legislative Comment to California Commercial Code Section 4303(b). As stated by the district court in Gutierrez, Section 4303(b) addresses the relationship between the bank and presenters of items for payments and states: "Subject to subdivision (a) [of this section], items may be accepted, paid, certified, or charged to the indicated account of its customer in any order." As part of the 1992 amendments to the California Commercial Code, a legislative comment was added to Section 4303 that stated:

> The only restraint on the discretion given to the payor bank under subsection (b) is that the bank act in good faith. *For example, the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.*

Cal. Com. Code § 4303(b), Calif. cmt. 7 (emphasis added). "Thus, banks were required to act in good faith when exercising discretion vis-a-vis posting order and could not, for example, establish posting practices for the sole purpose of maximizing penalties imposed on customers." Gutierrez, 730 F. Supp. 2d at 1121. Further, "[t]he same legislative comment also made clear that "discretion" as used in Section 4303(b) meant item-by-item discretion . . . A computer-driven high-to-low, one-size-fits-all resequencing of transactions does not employ any such item-by-item discretion." Id. at 1121-22.

Finally, the UCL proscribes any "unlawful business activity," which includes "'anything that can properly be called a business practice and that at the same time is forbidden by law.'"

Quesada v. Herb Thyme Farms, Inc., B239602, 2013 WL 6730808, at *2 n. 4 (Cal. Ct. App. Dec. 23, 2013)(quotation marks and citation omitted).  "[A] common law violation such as breach of contract is insufficient." Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1044 (9th Cir. 2010).

In the case at bar, HSBC seeks dismissal of the Plaintiffs' UCL claims based on "unlawful" business act or practice because the Plaintiffs' underlying legal theories within its complaint fail as a matter of law.  However, the Court has previously found that the Plaintiffs state a statutory claim under the FAL.  Thus, the Court concludes that the Plaintiffs' claim of a UCL violation based on the "unlawful" prong survives dismissal at this stage of the litigation. Cf. Cullen v. Netflix, Inc., 5:11-CV-01199 (EJD), 2013 WL 140103, at *8 (N.D. Cal. Jan. 10, 2013)("Because Plaintiff's claims of violations of the UCL, FAL, and CLRA fail, his UCL claim premised on 'unlawful' acts has no basis and must also fail.").

### III. CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED,** that the motion by the Defendants HSBC Bank USA, N.A., HSBC USA Inc. and HSBC North America Holdings Inc. to dismiss the amended consolidated class action complaint is granted to the extent that the amended consolidated class action complaint against HSBC USA Inc. and HSBC North America Holdings Inc. is dismissed without prejudice; and it is further

**ORDERED,** that the motion to dismiss the amended consolidated class action complaint is granted to the extent (1) all state law claims from states other than New York or California are dismissed without prejudice and (2) the breach of contract, conversion, and unjust enrichments claims under New York and California law are dismissed without

prejudice; (3) the New York General Business Law § 349 claim is dismissed as untimely and without prejudice; and (4) the CLRA claim is dismissed with prejudice; and it is further

**ORDERED,** that the motion to dismiss the amended consolidated class action complaint is denied to the extent that (1) the claims for breach of the implied covenant of good faith and fair dealing under New York and California law may proceed; and (2) the FAL and UCL claims may proceed.

**SO ORDERED.**
Dated: Central Islip, New York
March 5, 2014

_____*Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge